# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

| | |
|---|---|
| MARILYN MARSHALL, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No.: 7:21-cv-00231-JHE |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION[1]

Plaintiff Marilyn Marshall ("Marshall") seeks review, pursuant to 42 U.S.C. § 405(g) and § 205(g) of the Social Security Act, of a final decision of the Commissioner of the Social Security Administration ("Commissioner"), denying her application for supplemental security income ("SSI"), a period of disability, and disability insurance benefits ("DIB"). (Doc. 1). Williams timely pursued and exhausted her administrative remedies. This case is therefore ripe for review under 42 U.S.C. § 405(g). The undersigned has carefully considered the record and, for the reasons stated below, the Commissioner's decision is **REVERSED**, and this action is **REMANDED** for further proceedings.

## I. Factual and Procedural History

Marshall protectively filed applications for SSI, a period of disability, and DIB on August 7, 2018, alleging disability beginning on April 10, 2018. (Tr. 10, 181-93). The Commissioner initially denied Marshall's claim (tr. 94-98) and Marshall requested a hearing before an ALJ (tr.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties in this case have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 11).

99-100).  After a February 13, 2020 hearing, the ALJ denied Marshall's claim on April 10, 2020. (Tr. 7-28).  Marshall sought review by the Appeals Council, but it denied her request for review on December 16, 2020.  (Tr. 1).  On that date, the ALJ's decision became the final decision of the Commissioner.  On June 23, 2020, Marshall initiated this action.  (Doc. 1).

Marshall was fifty years old on her alleged onset date.  (Tr. 23).  Marshall has past relevant work as a certified nurse assistant, housekeeper, and child daycare center worker.  (Tr. 23).

## II. Standard of Review[2]

The court's review of the Commissioner's decision is narrowly circumscribed.  The function of this Court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied.  *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).  This court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence."  *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Id.*  It is "more than a scintilla, but less than a preponderance."  *Id.*

This Court must uphold factual findings that are supported by substantial evidence.  However, it reviews the ALJ's legal conclusions *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied.  *Davis v. Shalala*,

---

[2] In general, the legal standards applied are the same whether a claimant seeks SSI or DIB. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations for statutes or regulations found in quoted court decisions.

2

985 F.2d 528, 531 (11th Cir. 1993). If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining the proper legal analysis has been conducted, it must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

### III. Statutory and Regulatory Framework

To qualify for disability benefits and establish his or her entitlement for a period of disability, a claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.[3] The Regulations define "disabled" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505(a). To establish entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508.

The Regulations provide a five-step process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). The Commissioner must determine in sequence:

(1) whether the claimant is currently employed;
(2) whether the claimant has a severe impairment;
(3) whether the claimant's impairment meets or equals an impairment listed by the [Commissioner];
(4) whether the claimant can perform his or her past work; and
(5) whether the claimant is capable of performing any work in the national economy.

---

[3] The "Regulations" promulgated under the Social Security Act are listed in 20 C.F.R. Parts 400 to 499, revised as of April 1, 2007.

*Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993) (citing to the formerly applicable C.F.R. section), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561, 562-63 (7th Cir. 1999); *accord McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). "Once the claimant has satisfied steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her work, the burden shifts to the [Commissioner] to show that the claimant can perform some other job." *Pope*, 998 F.2d at 477; *accord Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). The Commissioner must further show such work exists in the national economy in significant numbers. *Id.*

## IV. Findings of the Administrative Law Judge

After consideration of the entire record and application of the sequential evaluation process, the ALJ made the following findings:

At Step One, the ALJ found Marshall had not engaged in substantial gainful activity since April 10, 2018, her alleged onset date. (Tr. 12). At Step Two, the ALJ found Marshall has the following severe impairments: obesity and depression. (Tr. 13). At Step Three, the ALJ found Marshall does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14).

Before proceeding to Step Four, the ALJ determined Marshall's residual functioning capacity ("RFC"), which is the most a claimant can do despite her impairments. *See* 20 C.F.R. § 404.1545(a)(1). The ALJ determined Marshall has the RFC

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can understand, remember, and carry out simple instructions; she can maintain attention and concentration for 2-hr periods at a time; she can adapt to routine and infrequent workplace changes; she can perform jobs that do not require interaction with the general public; and she can perform jobs that do not require working in tandem with co-workers.

4

(Tr. 18). At Step Four, the ALJ determined Marshall was unable to perform any of her past relevant work. (Tr. 23). At Step Five, the ALJ determined, based on Marshall's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy Marshall could perform. (Tr. 24-25). Therefore, the ALJ determined Marshall has not been under a disability and denied her claim. (Tr. 25).

## V. Analysis

Although the court may only reverse a finding of the Commissioner if it is not supported by substantial evidence or because improper legal standards were applied, "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (citing *Strickland v. Williams*, 615 F.2d 1103, 1106 (5th Cir. 1980)). The court, however, "abstains from reweighing the evidence or substituting its own judgment for that of the [Commissioner]." *Id.* (citation omitted).

Marshall raises two objections to the denial of her claims: (1) the ALJ improperly rejected the opinion of Dr. John Neville (doc. 16 at 4-12); and (2) the ALJ erroneously rejected Marshall's pain testimony (*id.* at 12-21). Because the first of these requires reversal and remand, the undersigned does not discuss the second.[4]

Dr. Neville, a licensed psychologist, provided a consultative examination of Marshall on November 6, 2018. (Tr. 359-63). At the examination, Marshall reported crying episodes, social withdrawal, thoughts of self-harm, and previous overdoses. (Tr. 360). She also reported memory

---

[4] In the section of her brief discussing Dr. Neville's opinion, Marshall also argues the ALJ failed to develop the record regarding her physical symptoms. (Doc. 16 at 10-11). The ALJ can reassess on remand whether this is warranted.

5

problems and poor concentration, along with a feeling that people do not care about her. (*Id.*). Dr. Neville indicated Marshall had clear and coherent speech, with no apparent speech abnormalities and no pressured speech, mumbling, slurring, or stuttering. (Tr. 361). Marshall had a dysphoric mood and appeared depressed, but did not appear angry, anxious, restless or psychotic. (*Id.*). Dr. Neville did not observe any hallucinations, delusions, ideas of reference, or loose associations. (Tr. 361-62). Marshall's judgment and insight were considered adequate. (Tr. 362).

As to Marshall's sensorium and cognition, Dr. Neville found Marshall was alert and well-oriented, knew the date and day of the week, responded correctly when asked her date of birth and age, and knew her home address. (*Id.*). However, Marshall did not know her home phone number. (*Id.*). Marshall completed three out of five calculations correctly on serial threes, responding 4, 6, 9, 12, and 16. (*Id.*). Marshall answered one out of two subtraction problems correctly and did not answer any multiplication problems correctly. (*Id.*). When counting backwards from 20 to 1, Marshall proceeded slowly and skipped several numbers, and she could not spell "world" backwards. (*Id.*). Marshall could recall four digits forward and two digits backward. (*Id.*). When asked about the past day's activities, Marshall recalled she stayed inside, slept, ate, and listened to a gospel station. (*Id.*). She knew her sons' birthdays and the current president, but incorrectly stated the name of the current governor. (*Id.*). She reversed the national and state capitals. (*Id.*). She answered one out of three questions about general information correctly. (*Id.*). While Marshall knew the meaning of the expression "don't cry over spilt milk," she did not know the meaning of "strike while the iron is hot." (*Id.*). She did not respond correctly to any items about similarities between paired objects. (*Id.*).

Based on Marshall's mental status examination, Dr. Neville estimated her intellectual functioning was in the mildly intellectually disabled to borderline range. (*Id.*). Consistent with

this, Dr. Neville provided a diagnosis of "Major Depressive Disorder, Recurrent Episode, Moderate" and provisional diagnoses of "Intellectual Disability, Mild" and "Rule Out Borderline Intellectual Functioning." (Tr. 363). In arriving at this provisional diagnosis, Dr. Neville reviewed the "medical evidence of record provided by the DDS." (*Id.*). He stated:

> Mrs. Marshall was considered cognitively able to understand and carry out simple instructions, but not complex instructions. Her ability to maintain concentration and sustain a reasonable work pace was considered moderately to severely impaired by her depression and level of cognitive functioning. A resumption of her anti-depressant treatment is recommended. Psychiatric treatment and psychotherapy are recommended to treat her depression. Her ability to respond appropriately to coworkers appeared moderately impaired by her depression. Mrs. Marshall's ability to cope with ordinary work pressures was considered moderately to severely impaired. She does not appear cognitively able to manage financial benefits independently.

(Tr. 363).

At Step Two, the ALJ rejected Dr. Neville's provisional diagnosis of mild intellectual disability. (Tr. 13). In doing so, she stated Dr. Neville's diagnosis was "based on mental status examination findings and not formal intellectual testing." (*Id.*). After generally summarizing Dr. Neville's findings, the ALJ cited Marshall's function report for the proposition that Marshall "has reported ability to perform activities such as prepare simple meals, clean, do laundry, manage her personal care, read the bible, and spend time with other [sic] once a week."[5] (Tr. 14). The ALJ also indicated Marshall had reported "that she is able to manage her personal care without problems, take her medications without needing reminders, prepare simple meals, wash dishes, sweep, mop, iron, ride in a car and leave home, shop in stores once or twice a month, pay bills, spend time with others, talk on the phone with others, pay attention for about 30 minutes, follow

---

[5] The function report was completed by Phyllis Marshall, not Marilyn Marshall. (Tr. 247). Portions of it are written in the third person. (*See* tr. 240).

a simple recipe, follow simple spoken instructions, and get along with others." (*Id.*). The ALJ noted Marshall had reported to Dr. Neville managing her personal care most days and attending church. (*Id.*). And the ALJ cited Marshall's past relevant work that was classified as skilled and semi-skilled. (*Id.*). On this basis, the ALJ concluded Dr. Neville's provisional diagnoses of Intellectual Disability and Rule Out Borderline Intellectual Functioning were non-severe. (*Id.*). However, she stated "the undersigned is cognizant of the substantial overlap in symptomology between different mental impairments, as well as the inherently subjective nature of mental diagnoses. Accordingly, the claimant's psychological symptoms and their effect on her functioning have been considered together, instead of separately, regardless of the diagnostic label attached." (*Id.*).

Later in her opinion, the ALJ found Dr. Neville's opinion "somewhat persuasive" on the basis that the evidence did not support moderate to severe impairment. (Tr. 22). The ALJ pointed to Dr. Neville's findings that Marshall "had clear and coherent speech, normal orientation, adequate insight and judgment, and thought processes negative for loose associations, confusion, hallucinations, delusions, ideas of reference, obsessions, or phobias." (*Id.*). The ALJ highlighted primary care findings showing Marshall "had normal memory, insight, judgment, and orientation, and appropriate mood and affect." (*Id.*). Finally, the ALJ indicated there was no evidence Marshall had sought treatment with a mental health professional until February 2019, when she was treated on an inpatient basis for suicidal thoughts, improved immediately with medication, and was discharged a couple of days later. (*Id.*).

Marshall argues the ALJ's rejection of Dr. Neville's opinion was improper for two somewhat overlapping reasons. As an initial matter, Marshall contends the ALJ improperly rejected Dr. Neville's opinion as unsupported by formal intellectual testing—testing the ALJ could

8

have ordered in order to adequately develop the record. (Doc. 16 at 7). Without formal intellectual testing, Marshall argues, the ALJ did not have an adequate basis to conclude Marshall did not meet Listing 12.05, which relates to intellectual disorder. (*Id.* at 6-7). And Marshall attacks the ALJ's reliance on other record evidence to discount Dr. Neville's opinion, arguing the evidence the ALJ cited was not actually inconsistent with Dr. Neville's findings. (*Id.* at 6). Both are discussed below.

### A. Marshall Was Not Prejudiced by the ALJ's Failure to Order IQ Testing

Social security regulations provide that "when the evidence [on record] . . . is inadequate for us to determine whether you are disabled, [the ALJ] will need additional information to reach a determination or a decision." 20 C.F.R. §§ 404.1512(e), 416.912(e). "It is well-established that the ALJ has a basic duty to develop a full and fair record. Nevertheless, the claimant bears the burden of proving that [s]he is disabled, and, consequently, [s]he is responsible for producing evidence in support of [her] claim." *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003) (internal citations omitted). "[T]here must be a showing of prejudice before it is found that . . . the case must be remanded to the Secretary for further development of the record." *Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997). "The court should be guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." *Id.* (citing *Brown v. Shalala*, 44 F.3d 931, 934-35 (11th Cir. 1995)) (internal quotation marks omitted).

As noted above, the ALJ concluded that Marshall did not meet any of the "listings" found at 20 C.F.R. Part 404, Subpart P, Appendix 1. However, she specifically discussed only Listing 12.04, the listing that for depressive, bipolar and related disorders. (Tr. 14-18). Consequently, she did not make any explicit conclusions about Listing 12.05. That listing provides:

> 12.05 Intellectual disorder (see 12.00B4), satisfied by A or B:

9

A. Satisfied by 1, 2, and 3 (see 12.00H):

    1. Significantly subaverage general intellectual functioning evident in your cognitive inability to function at a level required to participate in standardized testing of intellectual functioning; and

    2. Significant deficits in adaptive functioning currently manifested by your dependence upon others for personal needs (for example, toileting, eating, dressing, or bathing); and

    3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

OR

B. Satisfied by 1, 2, and 3 (see 12.00H):

    1. Significantly subaverage general intellectual functioning evidenced by a or b:

        a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or

        b. A full scale (or comparable) IQ score of 71–75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

    2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

        a. Understand, remember, or apply information (see 12.00E1); or

        b. Interact with others (see 12.00E2); or

        c. Concentrate, persist, or maintain pace (see 12.00E3); or

        d. Adapt or manage oneself (see 12.00E4); and

    3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 C.F.R. Part 404, Subpart P, Appendix 1.

Because the ALJ did not discuss Listing 12.05, she did not actually determine Marshall did not meet it due to the absence of a full-scale IQ test required by 12.05B1.[6] The Commissioner argues even if IQ tests *did* support a diagnosis of intellectual disorder, the ALJ properly concluded that Marshall did not establish limitations consistent with the requirements of 12.05B2 (the "Paragraph B criteria," (*see* tr. 14), which are identical to the requirements the ALJ discussed in considering Listing 12.04B2). (Doc. 19 at 9). In other words, the Commissioner contends Marshall was not prejudiced by the lack of IQ testing because the ALJ's analysis of the Paragraph B criteria was appropriate.

The parties' arguments do not exactly align. Marshall appears to contend the absence of formal IQ testing impacted the ALJ's assessment of Dr. Neville's opinion itself, and that the ALJ should have ordered testing to bolster Dr. Neville's opinion. It is true that the ALJ found Dr. Neville's opinion less probative of whether Marshall suffers from the severe impairments of intellectual disability or borderline intellectual functioning because his opinion was not supported by a formal IQ test. Marshall provides no authority that an ALJ is required to develop evidence to bolster a physician's opinion as to whether or not a particular severe impairment exists. And the Commissioner is correct that an ALJ is not required to develop the record with further IQ testing when he or she is satisfied that a claimant has only mild or moderate limitations in the four functional areas in 12.05B2. *See Elrod v. Saul,* No. 5:19-cv-005470-CLS, 2020 WL 4346769, at *5 (N.D. Ala. 2020) (findings a claimant has mild or moderate limitations in the four functional

---

[6] Marshall does not appear to argue, and the record does not support, that Listing 12.05A would apply. There is no evidence to support Marshall's dependence upon others for personal needs under 12.05A2, nor evidence regarding Marshall's functioning prior to age 22 under 12.05A2.

areas "would not necessitate further inquiry into claimant's IQ because the Listing requires both 12.05B1 and 12.05B2 to be met"). Consequently, Marshall was not prejudiced solely by the ALJ's failure to develop the record by requesting a formal IQ test.[7]

### B. The ALJ Erred in Evaluating Dr. Neville's Opinion

For claims filed on or after March 27, 2017, such as this case, an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s), including those from [the claimant's own] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the ALJ is required to "articulate in [his] determination or decision how persuasive [he] find[s] all of the medical opinions," 20 C.F.R. § 404.1520c(b), taking into account supportability, consistency, relationship with the claimant, length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, examining relationship, specialization, and "other factors." 20 C.F.R. § 404.1520c(c). Under the new regulations, an ALJ is required to explain how she considered the supportability and consistency factors, and may explain how she considered the remaining factors. 20 C.F.R. § 404.1520c(b)(2).

The ALJ's assessment of Dr. Neville's opinion was deficient under this standard. The ALJ found Dr. Neville's opinion only somewhat persuasive because "the evidence does not support moderate to severe impairment." (Tr. 22). To draw this conclusion, she relied on three pieces of evidence: (1) Dr. Neville's own findings that Marshall had "clear and coherent speech, normal orientation, adequate insight and judgment, and thought process and content negative for loose

---

[7] Although the absence of an IQ test alone does not require reversal, as discussed below, the ALJ's improper evaluation of Dr. Neville's opinion almost certainly infected the ALJ's evaluation of the Paragraph B criteria.

associations, confusion, hallucinations, delusions, ideas of reference, obsessions, or phobias"; (2) primary care examination findings showing that Marshall "had normal memory, insight, judgment, and orientation, and appropriate mood and affect"; and (3) Marshall's lack of mental health treatment.[8] (*Id.*). However, none of these is substantial evidence supporting the ALJ's conclusion.

Taking these in order, it is not apparent—and the ALJ does not explain—why Dr. Neville's relatively ordinary findings in some areas would impact his finding in other, logically distinct areas. For instance, the fact that Marshall was not experiencing confusion, hallucinations, delusions, or phobias during the examination appears to bear no relationship at all to whether her intellectual function impacts her ability to work. And whatever tension exists between Dr. Neville's findings and Marshall's speech, orientation, insight and judgment, and thought process is minimal at best, particularly in light of "the fundamental differences between the relaxed, controlled setting of a medical clinic and the more stressful environment of a workplace." *Simon v. Comm'r, Soc. Sec. Admin.*, 7 F.4th 1094, 1107 (11th Cir. 2021). In other words, the ALJ did not identify anything in the results of Dr. Neville's examination that actually conflicts with his opinion. Instead, the ALJ appeared to conclude that Dr. Neville's opinion as to Marshall's depression and intellectual function was undermined by the fact that he did not find evidence of other, unrelated disorders.

---

[8] The ALJ discussed these in terms of supportability alone and did not directly mention consistency with the record. 20 C.F.R. § 404.1520c(b)(2). The Commissioner separates this out in a way the ALJ does not, contending Dr. Neville's examination findings go to supportability, *see* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1) (explaining supportability considers the objective medical evidence and supporting explanations presented by a medical source to support his medical opinion), and the examination findings go to consistency, s*ee* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2) (explaining consistency considers how consistent the medical opinion is with evidence from other medical sources and nonmedical sources). (Doc. 19 at 20-21).

The ALJ's reliance on primary care examination findings was similarly misplaced. The ALJ cited examination findings from Maude Whatley Center showing Marshall "had normal memory, insight, judgment, and orientation, and appropriate mood and affect" at those visits. (Tr. 15-16, 22). However, the cited records refer to visits for hypertension (tr. 317, 322); hypertension and congestion (tr. 329); swelling, hypertension, back pain, and allergies (tr. 334); hypertension and "thyroids" (tr. 343); and hypertension and back pain (tr. 347, 351). It is unclear why a physician treating a patient for any of these complaints would explore the patient's mental state at anything but the most superficial level. Neither the ALJ nor the Commissioner provide any explanation for this.

Finally, the ALJ relied on Marshall's relative lack of mental health treatment.[9] (Tr. 22). This appears to relate to Marshall's depression alone, particularly in light of the ALJ's discussion of Marshall's brief hospitalization for suicidal thoughts. While this potentially impacts Dr. Neville's opinion as to limitations attributable to Marshall's depression, it does not appear to have any bearing on Dr. Neville's opinion as to limitations imposed by Marshall's intellectual function.

---

[9] Marshall alleges the lack of evidence of mental health treatment was due to the ALJ's error in failing to develop the record by not requesting mental health records from the Indian Rivers Health Clinic. (Doc. 16 at 10). The Commissioner contends the record contains these records, pointing to records dated February 4, 2019 to May 23, 2019. (Doc. 19 at 13-14) (citing tr. 376-90). The cited records do not appear to be the full set Marshall requested. The exhibit containing those records appears to have been received on June 17, 2019. (*See* tr. 364). However, Marshall's attorney requested complete records from Indian Rivers on October 8, 2019, and his letter informing the ALJ of that fact is dated February 6, 2020. (Tr. 272). Additionally, the ALJ acknowledged at the February 13, 2020 hearing that records from Indian Rivers remain outstanding (tr. 52, 67).

However, the Commissioner is correct that Marshall does not show she was prejudiced by the ALJ's failure to obtain these records. (Doc. 19 at 15-16). Marshall did not submit any new records to the Appeals Council, nor does she indicate at all what new and non-cumulative information appears in the purportedly missing records. Accordingly, the absence of the full records from Indian Rivers does not provide an independent basis for remand. That said, to the extent that such records exist, the ALJ should obtain them on remand.

This is somewhat complicated by the facts that (1) the ALJ considered Dr. Neville's opinion together with the opinion of state agency psychological consultant Dr. Robert Estock, who also considered Marshall's depression, and (2) the ALJ previously stated in rejecting Dr. Neville's provisional diagnosis of intellectual disability that "the claimant's psychological symptoms and their effect on her functioning have been considered together, instead of separately, regardless of the diagnostic label attached." [10] (Tr. 14). All that said, the absence of evidence of medical treatment, standing virtually alone, is not substantial evidence undermining Dr. Neville's opinion because the ALJ failed to explore any alternative explanations for Marshall's lack of treatment— for example, poverty, suggested by Marshall's reliance on food stamps (tr. 362). *See* SSR 16-3P ("We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints."); *Dawkins v. Bowen,* 848 F.2d 1211, 1213 (11th Cir.1988) ("poverty excuses [a claimant's] noncompliance" with medical treatment).

In *Simon, supra*, the Eleventh Circuit found an ALJ's allegations of inconsistency in the record must genuinely point to inconsistency:

---

[10] In rejecting Dr. Neville's provisional diagnosis of intellectual disability as a severe impairment, the ALJ also cited (1) what the Commissioner characterizes as Marshall's "wide range of reported daily activities" (doc. 19 at 10) and (2) Marshall's previous semi-skilled and skilled work. (Tr. 14). While the ALJ does not appear to have relied on either of these when she found Dr. Neville's opinion somewhat persuasive as it pertains to Marshall's work-related limitations, the undersigned notes that many if not most of the laundry list of daily activities the ALJ cited— Marshall's abilities to "prepare simple meals, clean, do laundry, manage her personal care, read the bible, and spend time with other [sic] once a week . . . manage her personal care without problems, take her medications without needing reminders, prepare simple meals, wash dishes, sweep, mop, iron, ride in a car and leave home, shop in stores once or twice a month, pay bills, count change, handle a savings account, watch television, color, work on crossword puzzles, spend time with others, talk on the phone with others, pay attention for about 30 minutes, follow a simple recipe, follow simple spoken instructions, and get along with others" (tr. 14)—bear little apparent inconsistency with the limitations Dr. Neville imposed.

> [T]he ALJ found it significant that Simon could feed himself, dress himself, and shop. But here again, the ALJ failed to identify any genuine inconsistency with Dr. Turner's findings. In our view, it goes almost without saying that many people living with severe mental illness are still capable of eating, putting on clothes in the morning, and purchasing basic necessities. None of those activities, however, say much about whether a person can function in a work environment—with all of its pressures and obligations—on a sustained basis. Without some reasonable explanation from the ALJ as to why completing basic household chores is inconsistent with a finding of disability, this evidence was not sufficient to discredit Dr. Turner.

7 F.4th at 1108. The Commissioner disputes *Simon* applies because *Simon* discusses now-superseded regulations requiring the ALJ to defer to a treating physician except in some circumstances. (Doc. 19 at 22). It is true that the *Simon* court specifically noted it "need not and do[es] not consider how the new regulation bears upon our precedents requiring an ALJ to give substantial or considerable weight to a treating physician's opinions absent good cause to do otherwise," 7 F.4th at 1104, and the Eleventh Circuit recently held that the Commissioner's subsequent regulations eliminating the treating physician rule also abrogated those precedents, *Harner v. Soc. Sec. Admin., Comm'r*, 38 F.4th 892, 896 (11th Cir. 2022). However, the issue here is not whether ALJ was required to defer to Dr. Neville's assessment absent good cause (or whether the evidence provided good cause at all), but whether the evidence the ALJ pointed to actually impacted the supportability or consistency of Dr. Neville's opinion. Even if *Simon* is not binding, its logic applies with equal persuasive force under the new regulations. If an ALJ finds an opinion less persuasive because it conflicts with or is not supported by the record, it ought to be in *genuine* tension with the portions of the record the ALJ cites. With the limited exception of Marshall's lack of medical treatment, the ALJ's opinion fails this standard. And, as discussed above, the lack of medical treatment is not substantial evidence by itself supporting the ALJ's decision to find Dr.

Neville's opinion only somewhat persuasive. Accordingly, this case is due to be remanded for the ALJ to appropriately consider Dr. Neville's opinion.

On remand, the ALJ should consider whether to develop the record further by obtaining IQ testing. Additionally, the ALJ should consider the impact of her reassessment of Dr. Neville's opinion on her view of other evidence, such as Marshall's testimony.

## VI. Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, the decision of the Commissioner of Social Security denying Marshall's claim for supplemental security income, a period of disability, and disability insurance benefits is **REVERSED**, and this action is **REMANDED**.

DONE this 28th day of September, 2022.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE